IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| MONTANA WILDERNESS ASSOCIATION;<br>GREATER YELLOWSTONE COALITION;<br>and THE WILDERNESS SOCIETY; | ) ) ) | |
| | ) | |
|        Plaintiffs, | ) | |
| | ) | |
|   vs. | ) | |
| | ) | |
| KATHLEEN McALLISTER, Regional<br>Forester for Region 1; REBECCA<br>HEATH, Supervisor of the Gallatin<br>National Forest; and UNITED STATES<br>FOREST SERVICE; | ) ) ) ) ) | |
| | ) | CV 07-39-M-DWM |
|       Defendants-<br>      Cross-defendants, | ) ) | CV 07-59-BLG-DWM<br>(consolidated) |
| | ) | |
|    and | ) | ORDER |
| | ) | |
| TREASURE STATE ALLIANCE;<br>MONTANA TRAIL VEHICLE RIDERS'<br>ASSOCIATION, MONTANA SNOWMOBILE<br>ASSOCIATION; UNITED FOUR-WHEEL-<br>DRIVE ASSOCIATIONS, INC; and<br>BLUERIBBON COALITION, INC.; | ) ) ) ) ) ) | |
| | ) | |
|       Intervenor Defendants,<br>      Cross-claimants. | ) ) | |

```
_____  )
                                           )
CITIZENS FOR BALANCED USE,                 )
GALLATIN VALLEY SNOWMOBILE                 )
ASSOCIATION, KENNETH ZAHN,                 )
and BIG SKY SNOWRIDERS,                     )
                                           )
          Plaintiffs,                      )
                                           )
          vs.                              )
                                           )
REBECCA HEATH, Gallatin National           )
Forest Supervisor, REGIONAL                )
FORESTER TOM TIDWELL, Region 1,            )
ABIGAIL KIMBALL, Chief of the              )
United States Forest Service,              )
                                           )
          Defendants,                      )
_____  )
```

## I.  Introduction and Background

This Order resolves dispositive motions in consolidated cases presenting

challenges to Gallatin National Forest Travel Management Plan and the associated

Final Environmental Impact Statement managing recreation and travel activities in

the Hyalite-Porcupine-Buffalo Horn Wilderness Study Area.  Environmental

Plaintiffs[1] have sued the Forest Service alleging that the Travel Plan violates the

law by permitting increased motorized and mechanized activity within the

---

[1]The "Environmental Plaintiffs" are environmental advocacy groups Montana Wilderness
Association, Greater Yellowstone Coalition, and the Wilderness Society, all plaintiffs in Case
No. CV 07-39-M-DWM.

statutorily designated Study Area.  Multiple-Use Plaintiffs[2] have challenged the

agency action from the other side, alleging that the Forest Service has issued a

Travel Plan that is too restrictive of motorized and mechanized recreational

activity within the Study Area.  Both sets of Plaintiffs are proceeding under the

Administrative Procedures Act ("APA") and state claims for violation of the APA,

the Montana Wilderness Study Act of 1977 ("Wilderness Study Act"), and the

National Environmental Policy Act ("NEPA").[3]

United States Magistrate Judge Jeremiah C. Lynch considered the parties'

dispositive motions for summary judgment and issued Findings and

Recommendations dated September 30, 2008, in which he recommends that the

Environmental Plaintiffs' motion for summary judgment be granted and the

Multiple-Use Plaintiffs' and Intervenors' motions for summary judgment be

denied.  Doc. No. 133.  The parties filed timely objections, thereby preserving

their right to de novo review of the Findings and Recommendations.  28 U.S.C. §

---

[2]The "Multiple-Use Plaintiffs" are Citizens for Balanced Use, Gallatin Valley Snowmobile Association, Kenneth Zahn, and Big Sky Snowriders, all plaintiffs in Case No. CV 07-59-BLG-DWM.

[3]Several multiple-use advocates including Treasure State Alliance, Montana Trail Vehicle Riders' Association, Montana Snowmobile Association, United Four-Wheel-Drive Associations, Inc., and Blueribbon Coalition, Inc. (collectively, "Intervenors") have intervened permissively in Case No. CV 07-39-M-DWM.  One of the Intervenors, Treasure State, then cross-claimed against the Forest Service, charging violations of the APA, the Wilderness Study Act, and NEPA.

636(b)(1).

This case raises an all too familiar question:  Whether a final agency action of the Forest Service complies with the Wilderness Study Act and other competing statutes that define national environmental policy.  In managing the national forests, the Forest Service must balance the competing interests of those wishing to enjoy the solitude and wildlife experiences the Study Area offers and others who wish to seek opportunities to enjoy motorized and mechanized recreational activity outdoors.  Simply put, because vehicle use can degrade the environment and interfere with opportunities for solitude and because of the inherent nature of off road motorized activity, the interests of vehicle users can conflict with the interests of those who visit the Study Area for other reasons.

The administrative record is replete with examples of the Forest Service's efforts to understand the impacts of various uses, how and where they conflict, and how to reasonably accommodate them and resolve the conflicts.  On the other hand, the case exemplifies a peculiar difficulty confronting the Forest Service that arises from two aspects of the record and the legislative history of the Wilderness Study Act.

First, the record shows that motorized and mechanized vehicle use in the Study Area has increased since the Wilderness Study Act was enacted in 1977.

Second, it shows that the Forest Service responded to this increase by reconfiguring the areas motorized and mechanized vehicles may use and the points of access to these areas. The Travel Plan expands and reconfigures the area snowmobiles may use in the winter, and decreases and reconfigures the area motorcycles and mountain bikes may use in the summer. It imposes seasonal restrictions and disallows all-terrain vehicles within the Study Area.

The legislative history of the Wilderness Study Act manifests a congressional intent that "until Congress determines otherwise," the areas it designated as wilderness study areas "be administered by the Secretary of Agriculture so as to maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System." Pub.L. No. 95-150, § 3(a), 91 Stat. 1243 (1977). The parties are familiar with the history of the Wilderness Study Act, and it will not be examined at length here. The following passage from this Court's decision in <u>Montana Wilderness Association v. United States Forest Service</u>, 146 F.Supp.2d 1118, 1120 (D. Mont. 2001) ("<u>Montana Wilderness</u>"), identifies the problem for the Agency and for all users posed by the Wilderness Study Act:

> The nature of the Forest Service's duty is complicated by the fact that Congress intended to reach a final decision on wilderness designation of these areas by 1984. The

> problem is that Congress did act, and did so unequivocally, but Congress' intent to finalize its intention by either designating the lands as Wilderness or releasing them for other use has never happened.
>
> Thus, for the Forest Service, a relatively short-term management task has burgeoned into a seemingly perpetual dilemma. Non-motorized users complain of "creeping motorization"; motorized users fear "creeping designation."

The Forest Service faces the identical dilemma in this case.

Given the increase in motorized and mechanized vehicle use in the Study Area, the Forest Service adopted a Travel Plan aimed at accommodating the increase while preserving a sense of balance among competing uses. There is no reason to doubt that the Travel Plan accomplishes this goal. But the Wilderness Study Act imposes on the Forest Service the conflicting obligation to maintain the wilderness character of the Study Area as it existed in 1977. Whether the Travel Plan meets this obligation is a different question from whether the record shows the Forest Service has a non-arbitrary basis for the balance it has struck amongst competing interests. While the Service has squarely met its administrative mandate to balance competing uses of public lands in a manner that is not arbitrary, it has not reached an accord with its statutory duty to preserve the wilderness character of the Study Area.

Practically speaking, the current legislative posture leaves the Forest

Service in an untenable position.  The agency has a mandate to promote and balance competing uses of public lands as reflected by the wishes of the people to whom those lands ultimately belong.  As the public's preferences for recreating on federal land have evolved, the balance has shifted toward facilitating some degree of access for motorized and mechanized recreational users.  Such an increase in motorized and mechanized recreational opportunities is not inconsistent with the agency's administrative mandate and can be achieved in a way that is not arbitrary or capricious, provided the interests of other users are accounted for and the overall health of the environment is not jeopardized.  But while the agency's administrative directive compels reasonable accommodation of the public's desire for increased motorized and mechanized recreation, there is an irreconcilable statutory pronouncement forbidding such action.

Until Congress acts to resolve the issue, the Forest Service will be trapped between its administrative obligation to reasonably balance competing land uses and the statutory requirement that it maintain the 1977 wilderness character of the place.  The tension between the law's inconsistent mandate can only be eased and resolved by Congress.

## II.  Analysis

**A.    Standard of Review**

Agency decisions are subject to a deferential standard of review:

> [A] reviewing court may set aside only agency actions
> that are "arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law."  5 U.S.C. §
> 706(2)(A).  Review under the arbitrary and capricious
> standard "is narrow, and [we do] not substitute [our]
> judgment for that of the agency."  Earth Island Inst. II,
> 442 F.3d at 1156 (citing U.S. Postal Serv. v. Gregory,
> 534 U.S. 1, 6-7 (2001)).  Rather, we will reverse a
> decision as arbitrary and capricious only if the agency
> relied on factors Congress did not intend it to consider,
> "entirely failed to consider an important aspect of the
> problem," or offered an explanation "that runs counter to
> the evidence before the agency or is so implausible that it
> could not be ascribed to a difference in view or the
> product of agency expertise."  Id. (citing Sierra Club v.
> U.S. Envtl. Prot. Agency, 346 F.3d 955, 961 (9th
> Cir.2003), amended by 352 F.3d 1186 (9th Cir.2003)).

Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008).

**B.    The Parties' Objections**

The parties initially attempted to use their objections to fully rebrief the

Court on their arguments.  In an order issued November 17, 2008, they were

reminded that 28 U.S.C. § 636(b)(1) only allows them to object to the Findings

and Recommendations, and not to rebrief their underlying motions.  Accordingly,

the substance of the Findings and Recommendations will not be restated here, and

the Court will only "consider the parties['] objections . . . and conduct a *de novo* review of the record in light of them."  Doc. No. 148 at 3.  The objections of the Forest Service, Intervenors, Multiple-Use Plaintiffs, and Environmental Plaintiffs are each considered in turn.

> **1.    The Forest Service's Objections**
>
> > **a.    The Forest Service's Use of the Wilderness Attribute Rating System**

The Forest Service objects first that Judge Lynch "erred in rejecting the Forest Service's use of the Wilderness Attribute Rating System ("Rating System") to evaluate the Study Area's wilderness character."  Specifically, the Service argues that Judge Lynch concluded that "volume of recreational use data was required to evaluate the effects of the Travel Plan on the wilderness character of the [Study Area]," and thereby "imposed a particular, additional requirement on the agency," contrary to the deferential standard of review afforded agency decisions.  The Service claims that the Rating System is an "adequate method for analyzing and evaluating the Travel Plan's impacts on 1977-era wilderness character," relying on this Court's decision in <u>Montana Wilderness</u>.

Contrary to the Service's suggestion, Judge Lynch did not categorically reject the Rating System as an evaluative tool, nor require in its place some

"particular, additional requirement." Judge Lynch observed what the record

demonstrates. In order to evaluate the effect of motorized use on wilderness

character, the Forest Service needed a baseline against which to evaluate changes

in use. The Forest Service recognized that it did not have statistically valid

recreation use data to serve this purpose in developing the Travel Plan, and

concluded that the absence of such data obviated the need to rely on any specific

data in determining effects to wilderness character. AR 16:B:23 at 3-571 – 3-572.

The Service thus simultaneously advances two arguments regarding the Rating

System: 1) the Rating System is an adequate evaluative tool for determining

wilderness character; and 2) because the Rating System contains no relevant data

regarding the impacts to wilderness character of motorized and mechanized

vehicle use, no such data is necessary.

The Service notes that "volume of recreation use was not a component of

the original [Rating System] evaluations," and concludes that "discrete data that

tracks changes in the volume of use over time are not necessary for evaluating the

effects of the proposed travel plan changes[.]" Id. at 3-572. Judge Lynch found

this argument unpersuasive. Without scientific data showing that the reconfigured

area for motorized and mechanized vehicle use accounts for the impact to

wilderness character caused by increased intensity of use, Judge Lynch concluded

- 10 -

the Service "entirely failed to consider an important aspect of the problem" and thus its decision was arbitrary and capricious.  Lands Council, 537 F.3d at 987. Judge Lynch found that the Travel Plan violated the Wilderness Study Act and NEPA not because the Forest Service relied upon the Rating System, but because it failed to explain how, in light of these increases, the reconfiguration achieves the requirements of Wilderness Study Act.  See 40 C.F.R. § 1502.2(d) ("Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.").

    Given the absence of relevant data in this context, it is hard to see how the decision could pass muster under even the deferential standard of review articulated in Lands Council.  This is not because the Court is imposing on the Service a novel requirement, but rather because of details specific to the Travel Plan at issue here.  As Judge Lynch stated, this case is not like Central Montana Wildlands Association  v. Kimball, No. 04-175-M-DWM (D. Mont. 2006) ("Central Montana Wildlands"), in which the Court wrote:

> The Plaintiff seems to rely on no more than a notion that there is increased use, which is something the Forest Service must consider in any case.  While the Forest Service has no empirical basis to counter this, *the Travel Plan irrefutably minimizes motorized access to the area*.

Id. at 15 (emphasis added); see also id. at 14-15 ("In fact, the proposed action veers away from the balance this Court considered in Montana Wilderness and *virtually eliminates* motorized travel within the area.") (emphasis added).  The Travel Plan in this case increases the area snowmobiles may use, and contains other motorized vehicle use within a reconfigured area, but does not address how these changes relate to intensity of use.  It is possible that the reconfigured areas might result in decreased intensity of use because of their character and design.  But it is precisely this discussion that is missing from the look and analysis in the Final Environmental Impact Statement, and the omission renders the decision arbitrary and capricious.

Furthermore, the Final Environmental Impact Statement fails to adequately address the agency's obligations under 40 C.F.R. § 1502.22(b)(2).   The Service recognized that § 1502.22(b)(2) requires "a statement of relevance of the incomplete or unavailable information to evaluating reasonable foreseeable significant adverse effects on the human environment."  AR 16:B:23 at 3-572. The Forest Service provided no explicit statement regarding the relevance of the missing data to its evaluation.  The Service noted only that "[c]hanges in recreation use have certainly occurred . . . since 1977[,]" perhaps implicitly recognizing the relevance of the missing data to its determination of the effects on

- 12 -

wilderness character.  Id.  The relevance of the missing data is obvious.  It is impossible to "evaluat[e] reasonably foreseeable significant adverse impacts on the human environment" without it.  The Forest Service merely observed that the information was unavailable, and then concluded that because it was unavailable it was also unnecessary.  AR 16:B:23 at 3-572.  This was a mistaken course of conduct.[4]

The absence of any data regarding how area and concentration of use are related to intensity of use and effects to wilderness character amounts to a "fail[ure] to consider an important aspect of the problem," and thus the Service's decision violates Wilderness Study Act under the arbitrary and capricious standard of review.  Lands Council, 537 F.3d at 987.  By failing to explain how the changes meet the requirements of the Wilderness Study Act, the Forest Service violated NEPA.  See 40 C.F.R. § 1502.2(d).

### b.    Reduction of Area Open to Snowmobiles

---

[4]The Forest Service's objection to Judge Lynch's finding that the Service did not comply with 40 C.F.R. § 1502.22(b)(4) is well taken.  The record contains the Service's "evaluation of [reasonably foreseeable significant adverse] impacts based upon theoretical approaches or research methods generally accepted in the scientific community."  See AR 16:B:23 at 3-580 – 3-590.  This portion of the record shows the Service considered the direct and indirect effects of plan alternatives to the Study Area.  Even so, the problem remains.  While the Service noted the foreseeable significant adverse effects to various aspects of wilderness character under each alternative, it falls short of its obligation under the Wilderness Study Act to maintain the 1977-era wilderness character of the Study Area.

The Forest Service objects that Judge Lynch "requir[ed] that the winter Travel Plan reduce the area of snowmobile use in order to comply with [Wilderness Study Act]."  While the Findings and Recommendations impose  no such requirement, the Forest Service has a point.  Under circumstances like those at issue here, where the Service reconfigures the area for vehicle use within the Study Area and it has no intensity-of-use data from 1977, the only way its decision can survive the arbitrary and capricious standard of review is to substantially reduce the overall area for vehicle use or to reduce overall motorized and mechanized vehicle access.  See Cental Montana Wildlands at 15 ("While the Forest Service has no empirical basis to counter [plaintiff's claim that the travel plan allows increased use], the Travel Plan irrefutably minimizes motorized access to the area.").

The problem arises from the Wilderness Study Act's legislative history; Congress has failed to adhere to its own timetable.  While the Wilderness Study Act was intended to restrict changes to the character of wilderness study areas pending final decisions regarding their designation, it is now more than thirty years later and no congressional decisions have been made.  The Service is in an awkward position: it must keep the wilderness study areas in a state of suspended animation, even as data concerning what that state should be is scarce, if not

altogether absent, and growing more remote as the years pass without a decision from Congress.

The Court is then expected to defer to agency decisions regarding how to maintain the 1977-era wilderness character of wilderness study areas even when the Service concedes it has no reliable scientific data upon which to base decisions regarding wilderness character. It may be that the failure of the political branches to complete the process that began with the Wilderness Study Act in 1977 has produced what is mistakenly viewed as a mandate imposed by Judge Lynch. The difficulty the Forest Service faces is a consequence of political inaction, but neither the Court nor the Service has the authority to finish what the Congress started. If the practical effects of Judge Lynch's recommendation are as the Forest Service claims, it is because of political inaction and not judicial fiat.[5]

The Forest Service takes the position that "the record shows [it] did consider the volume of snowmobile use." Specifically, the Service contends that

---

[5]The Service argues that <u>Central Montana Wildlands</u> "implies that a shift in area of use is a valid management approach to address volume of use in order to ensure that wilderness character is being maintained." Even if this assumption is correct, the Court is not in a position to either approve or disapprove of the Travel Plan on such a categorical basis. Just because the Travel Plan shifted the area of use does not mean the Environmental Plaintiffs' challenge necessarily fails. The Travel Plan does more than shift the area of use. It increases the area available to snowmobiles and designates a reduced area for increased motorcycle and mountain bike use. While such a plan may adequately preserve wilderness character, there is no presumption that it does so.

although "site-specific data for the . . . [Study Area]" is absent, "[t]he Travel Plan

provides an extensive review of available national and regional . . . recreation use

data to provide a background and context for the decision-maker[.]"  The Final

Environmental Impact Statement contains considerable data regarding recreational

use of the Gallatin National Forest.  See AR 16:B:18 at 3-420 – 3-432.  The data

addresses recent patterns of use and leads to the conclusion that the Gallatin

National Forest "is among the top 40 most heavily used National Forests in the

nation."  Id. at 3-421.  "This data, as displayed, is only valid at the Forest level and

cannot be disaggregated to specific sites or locations."  Id. at 3-422.

    In its objections the Service suggests this data shows the Travel Plan

determined that the shift in the area of snowmobile use limited proliferation of

snowmobile use in the Study Area.  The Service cites the Record of Decision, in

which the Forest Supervisor states,

> To meet the requirements of the [Wilderness Study Act] .
> . . I have limited the proliferation of snowmobile use in
> the [Study Area] by geographically reconfiguring the
> approximate acres used by snowmobilers pre-1977 to a
> configuration of similar acreage that better matches areas
> snowmobilers told me were most desirable to them
> today.  My decision concentrates snowmobile use in less
> than 12% of the [Study Area] while preserving a large
> portion of it in winter settings with ample opportunities
> for solitude and challenge.

AR 16:I:01 at 15.  The Service does not explain how the data it references

maintains the 1977-wilderness character of the Study Area, nor does it point to

anything in the record that shows what that character was in terms of snowmobile

usage.  In the absence of a 1977-era baseline, the Service has not shown how the

data – which "cannot be disaggregated" and indicates that the Gallatin National

Forest "is among the top 40 most heavily used National Forests in the nation[,]" –

vindicates the Service's conclusion that the Travel Plan maintains the 1977-era

wilderness character of the Study Area.  The Forest Supervisor's conclusory

statement that it does is not enough to fend off the Environmental Plaintiffs'

challenge, even under the deferential standard of review in play here.[6]

### c.    Increased Motorcycle Use

The Forest Service goes on to object to Judge Lynch's finding that it failed

to consider increased motorcycle use, arguing that the Findings and

Recommendations impose a particular methodology on the Service rather than

reviewing for arbitrariness.  Judge Lynch observed what the record undisputably

shows, i.e. motorcycling in the [Study Area] has increased since 1977, and

---

[6]The Forest Service objects to the finding that "only 15,000 acres of the [Study Area] actually saw any snowmobile use" in 1977.  Doc. No. 133 at 19.  The point is irrelevant to the analysis.  The Service concluded it need not, because it could not, determine the effects to wilderness character of reconfiguring the area available for motorized and mechanized vehicle use in light of substantial increases in use since 1977.  The action thus violates the Wilderness Study Act.

concluded that while the Service reduced the trail-mileage available for motorcycle use by half and reduced trail-access points, it did not consider the effect on wilderness character of containing current motorcycle use within the reduced and reconfigured area.  Judge Lynch rejected the Service's argument from Central Montana Wildlands that reducing area of use is *per se* adequate compensation for an unspecified increase in use.

The Service contends that Central Montana Wildlands "did not impose a bright line rule . . . requiring that virtually all motorized use had to be eliminated to comply with [the Wilderness Study Act]."  In Central Montana Wildlands, the Court determined the plan at issue was not based on an arbitrary decision because (1) there was no evidence of increased use; and (2) the Service had reduced the area of use by 97 percent.  Central Montana Wildlands at 11, 14-15.

The Forest Service seems to suggest that because the issue is the same here, the Court should reach the same conclusion.  But the facts here are different.  Unlike in Central Montana Wildlands, motorcycle use levels have increased, and while the reduction in area of use and access is significant, the Service points to nothing in the record to show that the reduction, in light of increased use, maintains the 1977- era wilderness character of the [Study Area].

The Service argues as well that "it is impossible for the Forest Service to

- 18 -

anticipate whether restricting trail opportunities in the [Study Area] will shift users to other trails either within the [Study Area] or to trails on other portions of adjacent National Forest land, or concentrate users, and if so, how much."  Despite this concession that the Service is ignorant of the effects of its action, it points to portions of the record in support of its claim that it took action "to restore or maintain the 1977-era wilderness character of the [Study Area]."  The citations show: (1) ATV and motorcycle activities have increased in the last ten (10) years; (2) temporary closures of trail to ATVs would be reevaluated during the travel management revision; and (3) additional restrictions on motorized use have been enacted since 1977 to improve "the sense of remoteness" in response to numerous complaints in the mid-1990s regarding increased ATV use and in response to "soil, vegetation, and wildlife conflicts."  AR 17:21:04 at 33, 38.  The final Travel Plan prohibits ATV use, and closes an entire portion of the Study Area that motorcyclists sporadically used in the past.

The Service did not do "an extensive analysis of how the changing volume of motorized areas of use since 1977 has impacted the [Study Area]'s wilderness character today."  The Service's citations to the record do not support its claim to the contrary.  See AR 17:21:04 at 33, 38.  The record shows that the Service understood its obligations under the Wilderness Study Act and made a good faith

effort, given the data it had, to fulfill these obligations.  The Service argues that ATV restrictions, areas closed to motorcycles, and seasonal use restrictions demonstrate that the "wilderness character of the [Study Area] has been maintained or restored to its 1977-era level under the summer Travel Plan," without explaining how or why this is so.  The Service faults Judge Lynch for adopting Environmental Plaintiffs' "unsupported assertion that increased volume of use necessarily leads to adverse impacts on wilderness character."  The question is whether the Service had a non-arbitrary basis for concluding that the proposed changes would maintain the 1977-era wilderness character of the Study Area.  The record analysis leaves an empty space for an answer.

### d.    Consideration of Wilderness Character

The Forest Service contends that Judge Lynch required it to "focus on the discrete impacts to wilderness character . . . rather than making an assessment of the impact to wilderness character of the [Study Area] as a whole."  The Service cites to the record, which shows it found that the natural integrity, apparent naturalness, and perception of remoteness in the Study Area has improved since 1977 due to the acquisition of 37,000 acres of private lands.  AR 17:21:04 at 36. The acquisition prevented road construction in some areas.  Id.  This portion of the record also references tree planting, weed management, and timber harvests.  Id.

The Service argues that it did consider the wilderness character of the Study Area. But the question is not whether the Service generally considered the wilderness character of the Study Area. Instead the question is whether the Travel Plan maintains the 1977-era wilderness character of the Study Area. Judge Lynch found that the Service's decision did not consider how the Travel Plan impacted the Study Area's wilderness character in light of the obligation to maintain its 1977-era wilderness character. He did not find the Service ignored the wilderness character of the Study Area altogether.

### e.    Baseline for Wilderness Character as of 1977

The Forest Service objects to Judge Lynch's finding that it had no baseline against which to evaluate changes to wilderness character. It argues, "The record demonstrates that, although no numerical historical data from 1977 exists . . . the Forest Service used available information to determine 1977-era levels within the [Study Area] and established an adequate baseline of use." The Service cites AR 16:B:23 at 3-565 in support of its argument relating to the winter aspect of the Travel Plan, and to AR 16:B:23 at 3-563 and AR 17:21:04 at 8 as it relates to the Travel Plan's summer aspect. These portions of the record show, respectively, the area of snowmobile use within the Study Area in 1977, statistics regarding overall recreation use in the Study Area as of 1977, and motorized access routes in the

Study Area in the winter and summer as of 1977. The latter portion of the record

includes the statement that "[n]o statistically sound studies relative to use trends in

the [Study Area] have ever been done."

The Forest Service's Rating System provides an assessment of wilderness

character, but the Service explicitly stated in the Final Environmental Impact

Statement that it need not consider the characteristics the Rating System is

designed to evaluate.

> [S]everal commentators to the [draft] EIS recommended
> that effects analysis relative to wilderness character in the
> . . . [Study Area] consider changes in recreation use since
> 1977. The Gallatin National Forest does not have reliable
> (statistically valid) recreation use data available for this
> analysis, nor is it necessary to determine effects to the
> wilderness character.

AR 16:B:23 at 3-571. The Service now argues that despite this statement it had a

baseline against which to evaluate effects to 1977-era wilderness character. The

record indicates to the contrary.[7]

### f.    Mountain Bike Use

The Forest Service objects to the finding that there has been an "explosion

---

[7]The Forest Service objects to the finding that the Travel Plan opened the Buffalo Horn Trail to motorized use for the first time. The Service argues that while the 1977 Travel Plan closed the trail to motorized use, illegal use continued and users believed the route was open to motorized use. Because the Service acknowledged that it has no statistically valid baseline, it is not necessary to address the argument over how best to characterize trails that have been subject to continuous illegal use.

of mountain biking" in the Study Area since 1977.  Whether mountain biking has

exploded or merely increased, the Service must evaluate the Travel Plan's effect

on wilderness character, and must maintain the 1977-era wilderness character of

the Study Area.  The proper description of the increase in trail use by mountain

bikers does not affect the analysis about the character of the area.

### 2.    Intervenors' Objections

The Intervenors seek to defend the Travel Plan against the Environmental

Plaintiffs while also asking the Court to invalidate it, illustrating the hopeless

dilemma confronting the Forest Service.  It expends countless hours studying

problems like the one at issue here in a good faith attempt to fulfill its mandate to

allow multiple uses while preserving the character of the land in an artificial time

capsule as required by the Wilderness Study Act, only to be caught in a litigatory

crossfire.  Some groups challenge the agency's efforts to balance competing

interests, claiming it has not done enough; different constituencies question it for

doing too much.

In their first objection to Judge Lynch's Findings and Recommendations,

Intervenors argue that the magistrate's reasoning, if affirmed by this Court, leaves

the Forest Service in a helpless position despite its good faith efforts.  The

proposition is well taken.  But this consequentialist argument does not in itself

justify rejecting the Environmental Plaintiffs' arguments, or the reasons on which Judge Lynch based his decision. Intervenors must point to the record and show that the Service's decision, in light of what the Wilderness Study Act requires, was not arbitrary and capricious.

### a. The Magistrate's Interpretation of the Wilderness Study Act

Intervenors argue that the Findings and Recommendations did not properly apply this Court's prior interpretation of the Wilderness Study Act. They claim that since the decision in <u>Montana Wilderness</u> the Service has "conducted far more extensive analysis of wilderness character in the Montana [study areas], including application of [the Rating System.]" However, the analysis here does not compel the conclusion that reliance on the Rating System to assess wilderness character is always an inadequate basis for a final agency decision. Because increased use created the need for a new Travel Plan, the Service must relate intensity-of-use to the Study Area's wilderness character. The Service decided that because it had no intensity-of-use data, it need not consider this dimension of the Travel Plan. Considering the requirements of the Wilderness Study Act means that in this instance the Service's decision does not pass muster even under the deferential arbitrary and capricious standard of review.

**b.      Deference to the Agency's Decision**

Intervenors argue that Judge Lynch failed to defer to the Forest Service's decision as the arbitrary and capricious standard of review requires.  The contention is that the Findings and Recommendations imposed a burden on the Service "to prove it has considered every conceivable argument that could be raised against the [Travel] Plan."  This is not so, and it is clear that the Service has adjusted its policy in light of the history of litigation surrounding Wilderness Study Act.  The Forest Service Manual interim directive adopted in 2006 shows the Service's recognition of its obligations to comply with the statute.  The Service requires a line officer making project level decisions to consider effects to "wilderness character as it existed in 1977," and requires that new uses include documentation of how such uses maintain wilderness character.

Intervenors insist that because the Service is aware of its obligations the Court must assume it has met them, and that requiring the Service to *show* that it has complied is contrary to the arbitrary and capricious standard of review as clarified in Lands Council.  Treasure State points to the Rating System, which is included in the directive, and argues that the Service has followed this Court's guidance and used it as a benchmark in exercising its discretion.  But the changed condition necessitating the new Travel Plan was increased intensity of use.  The

- 25 -

Service's  response to this change was to reconfigure the usable area.  There must be something in the record showing that the area as reconfigured accommodates the increased intensity of use, and not only strikes a reasonable balance among competing uses, but also maintains the 1977-era wilderness character of the Study Area.

The planning documents at issue here are the Travel Plan and Final Environmental Impact Statement, not the Forest Service Manual.  The record shows that areas not previously open to motorized vehicles are now open, areas previously open are closed, ATVs are prohibited altogether, and mountain bikes (a new use) are allowed.  The Service must explain how the reconfigured areas for motorized and mechanized vehicle use preserve the 1977-era wilderness character of the Study Area.  This connection is missing from the record of decision.

### c.  The Cross-Claim Against the Forest Service

Intervenors characterize Judge Lynch's Order as overly critical of agency decisions to authorize motorized and mechanized vehicle use, and inappropriately deferential to agency decisions to restrict mechanized access.[8]  They claim to have

_____

[8]Intervenors say the Findings and Recommendations "incorrectly conclude that the Travel Plan allows for increased motorized use of the [Study Area]."  They also claim "that snowmobile and mountain bike use were increased by the Travel Plan and that the Forest Service therefore failed to consider whether such increased use affected wilderness character."  This objection is incoherent.  The Travel Plan is not suspect because it increases motorized and mechanized vehicle use.  It is problematic because the agency has not explained how the Travel Plan

relied on this Court's prior rulings in fashioning a cross-claim against the Travel Plan, focusing on the Wilderness Study Act as mandating a balance among competing uses, and not as "requiring [] a prohibition of motorized use."  The problem is not the Service's failure to strike a reasonable balance between motorized use and wilderness character; the problem is that the Service must strike a balance in a manner that maintains the 1977-era wilderness character of the Study Area.

Intervenors contend that if the Service "failed to adequately interpret the requirements of the [Wilderness Study Act] or to analyze the relevant data, these shortcomings should infect the entire agency analysis, not just those aspects of it that allowed mechanized use to continue."  Intervenors ask that the cross-claim be treated "to reflect similar flaws" in the Service's analytical methods.  Intervenors offer no argument or citation to the record, but seem to argue that if the Service's methods have resulted in an arbitrary and capricious decision to reconfigure areas of motorized and mechanized use and access, the decision must also be arbitrary and capricious in the way they claim it is.  Specifically, it must be faulted for arbitrarily restricting motorized and mechanized vehicle use.

This argument does not address Judge Lynch's analysis of the portions of

---

maintains 1977-era wilderness character.

the record Intervenors cite in support of the cross-claim.  Those citations were meant to show that the Service used an overly restrictive reading of the Wilderness Study Act, mistakenly taking it to prohibit changes in patterns of use.  However, the Travel Plan recognized that the statute allows for changes in patterns of use. Intervenors did not argue that the Travel Plan failed to maintain the 1977-era wilderness character of the Study Area, but instead took the position that it illegally restricted vehicle use by using 1977-era use as an "inflexible proxy for preserving wilderness character[.]"  Because no reliable use data for 1977 exists, and because this is the lynchpin of the foregoing analysis concluding that the Travel Plan does not meet the Wilderness Study Act's requirements, the objection is not well taken.

### 3.    Multiple-Use Plaintiffs' Objections

#### a.    Evidence of Snowmobile Use in the Record

Multiple-Use Plaintiffs object that "unreliable data was relied upon to find that winter snowmobiling intensity has increased to unacceptable levels within the [Study Area]."  Judge Lynch made no such finding.  Based on evidence of increased snowmobiling and the reconfigured area for snowmobile use, Judge Lynch concluded that to comply with the Wilderness Study Act the record must show that the Service maintained the wilderness character of the Study Area.

According to Multiple-Use Plaintiffs, the evidence pertaining to the amount of snowmobile use is false.  They claim the trail counts reflected in the record were not recorded near the Study Area, but rather on trails "significantly south of the [Study Area]" and separated from it by "difficult terrain."  The resolution of the legal issues here does not turn on the accuracy of the trail counts.  Although accurate trail counts are important, they have no bearing on whether the Forest Service has maintained the 1977-era wilderness character of the Study Area.

Even if the trail counts are as inaccurate as Multiple-Use Plaintiffs claim, the record still shows motorized and mechanized vehicle use has increased in the Study Area since 1977.  The Travel Plan must take into account the corresponding impact any such increased use has on wilderness character.  For the reasons already stated, it does not.  This requirement does not amount to a court order to "drastically reduce winter motorized use out of an abundance of caution," or to the court "enact[ing] further closures of prime recreation areas[.]"  It is, however, a ground for concluding the Travel Plan does not pass muster under the arbitrary and capricious standard of review.

### b.      Motion to Strike Extra-record Evidence

Multiple-Use Plaintiffs take issue with Judge Lynch's order striking the extra-record evidence they offered.  Judge Lynch granted the Forest Service's

motion to strike pursuant to 28 U.S.C. § 636(b)(1)(A).  The objection, therefore, is

construed as a request under Fed. R. Civ. P. 72(a) for relief from Judge Lynch's

ruling.  Under Rule 72(a), the Court "must . . . modify or set aside any part of the

order that is clearly erroneous or contrary to law."

Judge Lynch determined the evidence was proffered to attack the Forest

Service's methodology.  Because Multiple-Use Plaintiffs offered it to show the

Service should have relied on different data, Judge Lynch struck the evidence.

Inland Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981 (9th Cir. 1993)

(trial courts must defer to agency expertise on questions of methodology and limit

review of agency decisions to the administrative record).  Multiple-Use Plaintiffs

argue that they offered the evidence not to attack the Forest Service's

methodology, but rather "for the limited purpose of ascertaining whether the

[Forest Service] considered all the relevant factors or fully explicated its course of

conduct or grounds of decision."  See Asarco, Inc. v. E.P.A., 616 F.2d 1153, 1160

(9th Cir. 1980).

The extra-record evidence does not fall within one of the Ninth Circuit's

narrow exceptions to the prohibition against considering such evidence because

Multiple-Use Plaintiffs' ultimate disagreement is with the conclusions regarding

recreational use the Service's data supports.  See Ranchers Cattlemen Action

Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric., 499 F.3d 1108, 1117 (9th Cir. 2007). Judge Lynch's ruling on the Forest Service's motion to strike was not clearly erroneous or contrary to law.

### c.     The Forest Service's Response to Comments

Multiple-Use Plaintiffs next object to Judge Lynch's finding that their comment to the Draft Environmental Impact Statement was "not adequately descriptive or informative to the Forest Service to merit inclusion as a comment and response to the [Final Environmental Impact Statement]." The objection is ill-taken. Multiple-Use Plaintiffs argue, without citation to any authority, that the Service's use of the information means the information constituted a meaningfully structured comment. The record shows that the Service considered the information despite Multiple-Use Plaintiffs' failure to indicate what it purported to show. See City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th Cir. 1986).

Multiple-Use Plaintiffs object as well that the Service did not adequately respond to comments by Dr. Kenneth Zahn. Judge Lynch found that the Final Environmental Impact Statement adequately addressed the substance of Zahn's comments through responses to similar comments and modifications to the document. Multiple-Use Plaintiffs point to the letter Rebecca Heath sent to Zahn after the Final Environmental Impact Statement was complete, acknowledging that

the Service had not responded explicitly to each of his comments, and then doing so throughout the nine-page letter.  AR 1:19:5.  They claim this violated 40 C.F.R. § 1503.4(a), which requires that responses to comments be included in the Final Environmental Impact Statement.

Zahn's comments were adequately addressed.  See Navajo Nation v. U.S. Forest Service, 479 F.3d 1024, 1057 (9th Cir. 2007).  While the Multiple-Use Plaintiffs' objection may have a technical basis, the Service's treatment of Zahn's comments does not amount to a NEPA violation.  The record shows the Service considered, incorporated, and responded to the over 10,000 comments received, including Zahn's.

### d.    Characterization of Alternatives 1 and 2

Multiple-Use Plaintiffs go on to object to Judge Lynch's finding that Alternatives 1 and 2 the Service presented were "no-action alternatives."  They argue that because the off-highway vehicle ban was imposed in 2001, and Alternative 1 considered "off-route motorized vehicle travel as it was prior to 2001," it was not a  no-action alternative.  See AR 1:16:A:04 at 2-16.  Multiple-Use Plaintiffs emphasize that the Final Environmental Impact Statement even makes a distinction between Alternative 1 and a "no-action scenario."  See id. at 2-17.  A careful reading of the document dispels the objection.

The Service recognized the effect of the off-highway vehicle ban, its

exceptions, and the flexibility it affords the Service.  The Service articulated its

reasons for configuring Alternative 1 the way it did in light of the ban.  The record

shows the Service framed the alternative to provide a comparison of the potential

impacts of other alternatives against the known impact of continuing the present

course of action.  See AR 1:16:A:04 at 2-16 – 2-17. This satisfies the requirements

of NEPA.  The objection is without merit.  See Ass'n of Public Agency

Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1188 (9th Cir.

1997).

The same reasoning vindicates Judge Lynch's conclusion regarding

Alternative 2, which the Service formulated in light of "the possibility that use will

generally continue on the roads and trails being used today due to more active

Forest Service management on a site-specific basis and effective enforcement of

the Montana-Dakota off-highway vehicle decision."  AR 1:16:A:04 at 2-17.

Contrary to Multiple-Use Plaintiffs' argument, the record shows the Service

formulated Alternative 2, like Alternative 1, as a scenario reflecting a continuation

of the current course of action.  The alternatives do not violate NEPA because they

accounted for the continuation of the Service's current forest-management

strategy.

### 4.       Environmental Plaintiffs' Objections

Environmental Plaintiffs object only to the absence of a recommended remedy in the Findings and Recommendations.  They ask the Court to enjoin the Forest Service "from authorizing snowmobile use in areas of the [Study Area] where no snowmobile activity occurred in 1977," as shown on the map at AR 16:B:23 at 3-567.  They also want the Court to "leave the existing travel plan prescriptions for summer use in place pending the agency's completion of remand, but require the Forest Service to produce a remand decision that will ensure compliance with the [Wilderness Study Act] and NEPA[.]"

Perhaps Environmental Plaintiffs do not acknowledge the implications of their arguments that the Forest Service violated the Wilderness Study Act and NEPA, arguments that Judge Lynch found persuasive and with which this Court agrees.  As a remedy to the Service's violation of the Wilderness Study Act, restricting snowmobile use to areas where it occurred in 1977 misses the point.  It might at first glance seem a safe guess as to how to maintain the 1977-era wilderness character of the Study Area, but it does not take into account the increase in snowmobile usage since 1977, all of which would be contained in this area.  This is the very basis upon which Environmental Plaintiffs challenge the summer portion of the Travel Plan – it contains increased intensity of use in a

reconfigured area.  The proposed remedy contravenes this Court's observation in

Montana Wilderness that the Wilderness Study Act was not intended to freeze

patterns of use in the wilderness study areas as of 1977.  See Montana Wilderness,

146 F.Supp.2d at 1124 ("Congress did not require a 'freeze' of all activity.  It

contemplated that use levels might fluctuate and that types of motorized vehicles

might change.").  The problem the Service faces here will surely surface again.

Does containing an increase in snowmobile use within the area designated over

thirty years ago for such use maintain the 1977-era wilderness character, and if so,

how can the Service show that it does?

     Likewise, what can the Service do on remand to bring the summer portion

of the Travel Plan into compliance with the Wilderness Study Act?  As noted

above, the Service has never produced a baseline against which to evaluate

changes in the intensity of motorized and mechanized vehicle use and its

relationship to the Study Area's wilderness character as of 1977.  A remand that

"ensure[s] compliance" with the statute is unlikely because of the legal status of

the land as circumscribed by Congress's intent to act but its failure to do so.  The

Service argues a position into which it is forced and which necessarily defeats its

principled argument that its decision is not arbitrary.  Concurrently, Environmental

Plaintiffs suggest a remedy that is implausible when evaluated against their own

arguments that the Service's decision to implement the Travel Plan is arbitrary and capricious. The legislative impasse complicates a remand to the Service with anything other than hollow instructions to comply with the statute – instructions which the Service, according to the record of decision, cannot follow.

The Service knew it had to comply with Wilderness Study Act and had this in mind when it reconfigured the Travel Plan. The detailed description of the decision reflects extensive, careful, and time consuming (not to mention expensive) work. But without some measure of what the statute requires, the Court cannot defer to the agency's decision even under the deferential standard of review articulated in <u>Lands Council</u>. <u>See</u>, <u>e.g.</u>, <u>Greater Yellowstone Coalition v. Timchak</u>, 2006 WL 3386731 *7 (D. Idaho) (holding that the Wyoming Wilderness Study Act (1984) required "an extensive discussion of the 1984 wilderness character, and then a thorough analysis comparing the proposed action with that . . . baseline.").

The Wilderness Study Act was enacted in the context of Congress's expectation that further legislation determining the status of the affected areas would be timely signed into law. That legislation was never enacted. The historical moment the Service could have used to create a baseline for 1977-era wilderness character against which modern changes could be evaluated has long

since passed.  Political inaction or impossibility leaves a void the Forest Service

understandably attempts to fill and that some exploit to complicate the Service's

efforts – some bona fide, others not – at forest management.  The Court is in turn

placed in the position of being asked to fill in the void the political branches have

left, a void that has burdened the Forest Service with the Sisyphean challenge of

forest management under the Wilderness Study Act.  It is simply not within the

providence of this Court to furnish the long overdue resolution of this issue that

the agency, the parties, and the public need and deserve.  Absent a Promethian Act

of Congress, the Forest Service will continue to be confronted with a Sisyphean

challenge.

### III.  Order

For the reasons set forth in this Order,

IT IS HEREBY ORDERED that the Findings and Recommendation (Doc.

No. 133) is adopted insofar as it is not inconsistent with this Order;

IT IS FURTHER ORDERED that Treasure State's Motion for Summary

Judgment (Doc. No. 65) is DENIED;

IT IS FURTHER ORDERED that MWA's Motion for Summary Judgment

(Doc. No. 66) is GRANTED;

IT IS FURTHER ORDERED that CBU's Motion for Summary Judgment

(Doc. No. 67) is DENIED;

IT IS FURTHER ORDERED that the Forest Service's Cross Motion for Summary Judgment against Treasure State (Doc. No. 80) is GRANTED;

IT IS FURTHER ORDERED that the Forest Service's Cross Motion for Summary Judgment against MWA (Doc. No. 82) is DENIED;

IT IS FURTHER ORDERED that the Forest Service's Cross Motion for Summary Judgment against CBU (Doc. No. 93) is GRANTED;

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of Environmental Plaintiffs and against Intervenors, Multiple-use Plaintiffs, and the Forest Service;

IT IS FURTHER ORDERED that the Forest Service is enjoined from the continued implementation of the Travel Plan, and this matter is remanded to the agency for further proceedings consistent with the Montana Wilderness Study Act. Such proceedings should begin with reference to the Montana Congressional delegation for action or advice as to the proper resolution of Congress' 1977 stated intention to resolve which part of the Study Area is wilderness and which is not.

IT IS FURTHER ORDERED that this case is CLOSED.

Dated this 29th day of September, 2009.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT